## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

COLIN COGLE, individually and
behalf of all others similarly situated,

      Plaintiff,

    v.

GENERAL MOTORS, LLC,
ONSTAR, LLC, and LEXISNEXIS
RISK SOLUTIONS, INC.

      Defendants.

Case No.

**CLASS ACTION COMPLAINT
AND JURY DEMAND**

## CLASS ACTION COMPLAINT

Plaintiff Colin Cogle, on behalf of the Class defined below, brings this action against Defendants General Motors LLC ("GM"), OnStar, LLC ("OnStar"), and LexisNexis Risk Solutions, Inc. ("LexisNexis") (collectively, "Defendants") and alleges as follows:

## NATURE OF THE ACTION

1.    Plaintiff is a GM vehicle owner whose driving-behavior and location data was surreptitiously taken by GM and OnStar and sold to third parties, like LexisNexis, without his knowledge or consent. Plaintiff seeks relief on behalf of himself and other similarly situated persons in the United States ("Class Members") who purchased or leased a GM vehicle and had their location and driving-behavior data transmitted to LexisNexis.

2.    GM owns and operates OnStar, which provides subscription-based services offered in GM vehicles. By default, GM installs OnStar hardware and software in leased or purchased GM vehicles manufactured in model year 2015 or newer. OnStar offers a variety of safety and connectivity-based services to customers who subscribe.

3.    OnStar provides GM vehicle owners and lessees a free program, known as the "OnStar Smart Driver Program," which collects and stores detailed

1

information about their driving behavior. OnStar represents that it only collects this information from customers who consent and enroll in the program.

4.      GM and OnStar nevertheless tracked information about Plaintiff's and Class Members' driving behavior in granular detail, including their speed, location, acceleration, and braking behaviors, even though they did not subscribe to the OnStar Smart Driver program. GM and OnStar transmitted Plaintiff's and Class Members' driving information to third-party data brokers, including LexisNexis, which subsequently sold it to auto insurance companies, which used it to raise insurance premiums for drivers such as Plaintiff.

5.      Plaintiff and Class Members did not consent to GM or OnStar collecting and profiting from data collected from their GM vehicles related to their driving. At no point did GM or OnStar disclose to Plaintiff or Class Members that it would collect and sell information about their driving behavior to third parties such as LexisNexis, who would in turn provide it to their insurers.

6.      GM's and OnStar's undisclosed monitoring and sale of Plaintiff's and Class Members' driving-behavior data to LexisNexis violates their reasonable expectations and violates federal and state privacy and consumer protection laws. Plaintiff and Class Members accordingly seek appropriate damages.

## JURISDICTION AND VENUE

7.     The Court has personal jurisdiction over each Defendant. GM and OnStar are headquartered in this District. Each Defendant transacts business and is admitted to do business in Michigan; maintains substantial contacts in Michigan; and committed the violations at least in part in Michigan.

8.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff's claims arise in part under federal law: the Wiretap Act, 18 U.S.C. § 2510 *et seq*. The Court also has subject matter jurisdiction under 28 U.S.C. § 1332(d) because there are more than 100 Class Members, the amount in controversy exceeds $5 million (excluding interest and costs), and at least one Class Member is a citizen of a state different from Defendants' states of domicile. The Court has supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367.

9.     Venue is proper under 28 U.S.C. § 1391 because GM and OnStar are headquartered in this District, LexisNexis has offices in Troy, Michigan, substantial parts of the events giving rise to the claims in this action relate to activities in this District, and Defendants conduct substantial business in this District.

## PARTIES

### Plaintiff Colin Cogle

10.     Plaintiff Colin Cogle is an adult citizen of the state of Connecticut who resides in Brookfield, Connecticut.

3

11.     Mr. Cogle purchased a 2019 Chevy Bolt EV in November 2022 from Premier Kia in Branford, Connecticut.

12.     At no time did Mr. Cogle sign up for an OnStar subscription.

13.     At no time did Mr. Cogle sign up for OnStar's Smart Driver Program.

14.     At no time was Mr. Cogle aware that OnStar was collecting information about his driving behavior and sharing that information with any third party, including his auto insurance company.

15.     Since purchasing his Chevy Bolt, Mr. Cogle has been insured through Geico.

16.     In February 2024, Mr. Cogle received notice from Geico that his insurance premiums would increase by more than $150 per month.

17.     Mr. Cogle never consented to having information about his driving behavior shared with his insurance company.

**Defendants**

18.     Defendant GM is a limited liability company organized under the laws of Delaware, with its headquarters and principal place of business located in Detroit, Michigan. GM is a multinational automotive manufacturing company that manufactures and sells vehicles throughout the United States and around the world, including Chevrolet, Buick, GMC, and Cadillac branded vehicles.

19.    Defendant OnStar is a limited liability company organized under the laws of Delaware, with its headquarters and principal place of business located in Detroit, Michigan. OnStar, a GM subsidiary, provides subscription-based communications, in-vehicle security, emergency services, turn-by-turn navigation, and remote diagnostics systems throughout the United States.

20.    Defendant LexisNexis Risk Solutions Inc. is a corporation organized under the laws of Delaware, with its headquarters located in Alpharetta, Georgia.

## FACTUAL ALLEGATIONS

### A.    GM and OnStar collect and send user data from all GM vehicles equipped with OnStar to LexisNexis

21.    Beginning with model year 2015, all GM vehicles available for lease or sale in the United States have been equipped with OnStar software and tracking technologies.

22.    These software and technologies are essential to OnStar's core business, which consists of selling subscription-based services to GM vehicle owners and lessees. Using OnStar software, GM drivers may access a suite of safety and connectivity-focused services, including roadside assistance, automatic crash response, remote vehicle access, and turn-by-turn navigation.

23.    OnStar's services primarily rely on its embedded telematics software, which transmits data directly from a customer's GM vehicle to OnStar. OnStar utilizes GM's connected car apps, known as myChevrolet, myBuick, myGMC, and

5

myCadillac, to provide additional services, such as remote vehicle access.

24.     In addition to its subscription-based services, OnStar offers GM drivers access to "OnStar Smart Driver," a free program that is available through GM's connected car apps. OnStar promotes this program as an "optional service," which provides drivers with unique insights about their driving behavior in order to maximize vehicle performance, reduce wear and tear, and encourage safe driving.[1]

25.     To encourage driver participation in this program, OnStar promises to provide drivers with unique insights and monthly summaries, while promoting opportunities to complete specific challenges and earn "badges."

26.     Once a customer enrolls in this program, OnStar collects and stores a variety of information from the customer's vehicle, including "hard braking events, hard acceleration events, speeds over 80 miles per hour, average speed, late night driving, seat belt usage, when and where these events occur, and the number of miles driven."[2] This information is collected from each vehicle and stored after each drive.

27.     While OnStar promotes this program as a way to promote safe driving, OnStar uses the detailed telematic information it collects from GM vehicles to generate a profit. It does so by selling the information it collects from vehicles to third-party data brokers, such as LexisNexis.

---

[1] https://www.onstar.com/support/faq/smart-driver (last accessed Apr. 22, 2024).
[2] *Id.*

28.    As shown in Figure 1 below, OnStar claims that it collects data from customers "upon consent and enrollment" in this optional program.[3]

—   **What information does OnStar Smart Driver capture?**

Upon consent and enrollment in OnStar Smart Driver, depending on vehicle capability, the vehicle will collect specific driving behavior data, including hard braking events, hard acceleration events, speeds over 80 miles per hour, average speed, late-night driving, when a trip occurs and the number of miles driven.

**Figure 1**

29.    In fact, OnStar collects this in-depth driving-behavior information from *all* GM vehicles equipped with OnStar software, regardless of whether a customer is subscribed to OnStar or has otherwise consented to and enrolled with the "OnStar Smart Driver" program.

30.    Once collected, GM and OnStar transmitted this unique driving-behavior information to third-party data brokers, including LexisNexis.

31.    LexisNexis and other data brokers then incorporated this specific information into consumer reports, which they then sold to automobile insurance companies.

32.    LexisNexis knowingly obtained this driving-behavior information from OnStar and GM as part of a well-established system of gathering driver-specific data to package and sell to automobile insurance companies.

33.    This suite of products promoted and sold by LexisNexis allows auto insurers to better assess driving risk, including by connected car data and telematics

---

[3] *Id.*

7

data from products such as OnStar. As LexisNexis explains, "[i]nsurers can use these new insights collected from real-world driving behavior to potentially offer better pricing for consumers, as telematics data is highly predictive of driving risk."[4] LexisNexis further notes that using telematic data provides "insurers . . . the opportunity to more accurately assess risk at point of quote, underwriting, renewal and more, whether or not they have an existing insurer-led usage-based insurance (UBI) program."[5]

34.    Auto insurance companies rely on these consumer reports, and the telematics data contained within them, to determine (and typically increase) premiums for insured drivers.

### B.    GM and OnStar did not adequately disclose to consumers that their information would be collected and shared with LexisNexis

35.    At no point did GM or OnStar disclose to customers, including those who did not sign up for the "OnStar Smart Driver" program, that their driving-behavior information would be collected and sold to LexisNexis or any other third party, much less to their automobile insurance companies for potential use in increasing insurance rates.

---

[4] https://risk.lexisnexis.com/about-us/press-room/press-release/20220628-telematics-exchange-5-year-anniversary (last accessed Apr. 22, 2024).
[5] https://risk.lexisnexis.com/products/telematics-exchange?trmid=INSTEL22.TelPromo22.PRTelExch.WSLN-684101 (last accessed Apr. 22, 2024).

36.    Even for Class Members who opted in to this "optional" program, GM and OnStar represented that any data would be kept secure and would not be shared without proper consent. For example, as of January 16, 2024, the "Help" page for the OnStar Smart Driver program made several assurances about the security of driver data, as shown in Figure 2, below.[6]

— **How does OnStar protect against personally identifiable information from being shared?**

OnStar takes the security of its Members' data very seriously. We use technical, administrative and physical safeguards designed to help protect Members' information from loss, misuse and unauthorized access, disclosure, alteration, destruction or theft. OnStar doesn't share personally identifiable information with an insurance company without your express consent.

— **Will other OnStar Members be able to see my information?**

No. Your OnStar Smart Driver information will not be visible to other OnStar Members unless you have shared your vehicle with another individual through Family Sharing.

**Figure 2**

37.    At no point in this or any other disclosure did GM or OnStar inform either customers who (1) did enroll in the "OnStar Smart Driver Program" and agreed to have their information collected, or (2) did not enroll and were wholly unaware that their information was being collected, that GM and OnStar were selling this information to LexisNexis.

38.    As such, even GM vehicle owners or lessees who enrolled in the

---

[6] https://web.archive.org/web/20240116231547/https://www.onstar.com/support/faq/smart-driver (last accessed Apr. 22, 2024).

"OnStar Smart Driver Program" had no reasonable expectation that their information would be sold and transmitted to LexisNexis and, eventually, their insurance companies.

39.    Plaintiff and Class Members suffered actual damages because their vehicle driving behavior was shared without their knowledge or consent with third parties, such as their insurance companies, including but not limited to the invasion of their privacy, the sale of their data without just compensation, and adverse credit reporting and affected credit scores.

## CLASS ACTION ALLEGATIONS

40.    Plaintiff brings this lawsuit under Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), (b)(3) and/or (c)(4) as a representative of the following Class and constituent Subclass (collectively, the "Class"):

> **Class:** All persons residing in the United States who leased or owned a GM vehicle and who, without their consent, had their vehicle driving data collected, stored, distributed, and/or sold by Defendants.

> **Connecticut Subclass:** All persons residing in Connecticut who leased or owned a GM vehicle and who, without their consent, had their vehicle driving data collected, stored, distributed, and/or sold by Defendants.

41.     Excluded from the Class are Defendants and their officers, directors, employees, affiliates, legal representatives, predecessors, successors and assigns, and any entity in which any of them has a controlling interest, as well as all persons employed by counsel in this action and any Judge to whom this case is assigned, his or her spouse and immediate family members, and members of the Judge's staff.

42.     The Class Period extends from the date that Defendants began implementing the practices described in this Complaint to the date of entry of judgment. Plaintiff reserves the right to modify the Class and Subclass definitions or propose additional subclasses as appropriate based on further investigation and discovery.

43.     Numerosity. The members of the Class are so numerous that joinder of all members would be impracticable. While the number of Class Members is unknown to Plaintiff at this time, they are estimated to number at least in the hundreds of thousands. The identity of Class Members is readily ascertainable from Defendants' records.

44.     Typicality. Plaintiff's claims are typical of the claims of the Class because Plaintiff and all Class Members suffered the same or similar injuries and were subjected to Defendants' wrongful tracking and sale of their vehicle driving data.

45.    <u>Adequacy of Representation</u>. Plaintiff will fairly and adequately represent the interests of the Class Members. Plaintiff's interests are coincident with, and not antagonistic to, those of the Class Members. Plaintiff is represented by attorneys experienced in the prosecution of class action litigation, including consumer privacy litigation, who will vigorously prosecute this action for the Class.

46.    <u>Common Questions of Law and Fact Predominate</u>. Questions of law and fact common to the Class Members predominate over questions that may affect only individual Class Members because Defendants have acted on grounds generally applicable to the Class. The following questions of law and fact are common to the Class and predominate over any individual issues:

a.    Whether GM and OnStar collected and tracked Plaintiff's and Class Members' driving behavior;

b.    Whether Plaintiff and Class Members consented to have their data shared with LexisNexis and other third parties;

c.    Whether LexisNexis sold Plaintiff's and Class Member's driving-behavior data to third parties without adequate or appropriate consent;

d.    Whether LexisNexis intentionally tapped the lines of electronic communication between Class Members and OnStar as they operated their GM vehicles;

e.    Whether LexisNexis intentionally intercepted the private information of Class Members in transit without their consent;

f.    Whether GM aided and abetted LexisNexis' intentional interception of the private information of Class Members in transit without their consent;

g.    Whether Defendants' conduct constitutes violations of the Fair Credit Reporting Act;

h.    Whether GM and OnStar violated state and federal laws by tracking and collecting vehicle driving data from GM vehicle owners and lessees, even when they did not consent to being tracked;

i.    Whether Class Members have a reasonable expectation of privacy with respect to such information;

j.    Whether Defendants' invasion of Class Members' privacy rights is highly offensive to a reasonable person;

k.    Whether Defendants' conduct constitutes unfair or deceptive acts or practices;

l.    Whether Plaintiff's and Class Members' vehicles were worth less than as represented as a result of the conduct alleged herein;

m.   Whether Defendants were unjustly enriched as a result of their wrongful and invasive practices; and

n.   Whether Class Members are entitled to damages, and the amount of such damages.

47.   <u>Superiority</u>. A class action will permit numerous similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without unnecessary duplication of evidence, effort, or expense. A class action will provide injured individuals a method for obtaining redress on claims that could not practicably be pursued individually. Plaintiff knows of no manageability issue that would preclude maintenance of this case as a class action.

48.   Class certification is also appropriate under Rules 23(b)(1), (b)(2), and/or (c)(4) because:

- The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Defendants;

- The prosecution of separate actions by individual Class Members would create a risk of adjudications that would, as a practical matter, be dispositive of the interests of other Class Members not parties to the adjudications, or would substantially impair or impede their ability to protect their interests;

14

- Defendants have acted or refused to act on grounds generally applicable to the Class, making injunctive and corresponding declaratory relief appropriate with respect to the Class as a whole; and

- The claims of Class Members are comprised of common issues whose resolution in a class trial would materially advance this litigation.

## **TOLLING OF THE STATUTES OF LIMITATIONS**

49.    All applicable statute(s) of limitations have been tolled by Defendants' knowing and active concealment and denial of the facts alleged herein. Plaintiff and Class Members could not have reasonably discovered Defendants' practice of tracking and using vehicle driver data until shortly before this class action litigation began.

50.    Defendants were and remain under a continuing duty to disclose to Plaintiff and Class Members their practice of tracking and using vehicle driver data. As a result of Defendants' active concealment, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled, and Defendants are estopped from asserting a statute of limitations defense.

## FIRST CLAIM FOR RELIEF

### VIOLATION OF THE WIRETAP ACT
### 18 U.S.C. § 2510 *et seq*.
### (On Behalf of the Class Against All Defendants)

51.     Plaintiff incorporates the above allegations by reference as if fully set forth herein and brings this count individually and on behalf of the Class.

52.     The Wiretap Act, as amended by the Electronic Communications and Privacy Act of 1986 ("ECPA"), prohibits the intentional interception of any wire, oral, or electronic communication.

53.     18 U.S.C. § 2520(a) provides a private right of action to any person whose wire, oral or electronic communication is intercepted.

54.     **Electronic Communications.** The communications between Plaintiff and Class Members and OnStar's systems are "transfer[s] of signs, signals, writing, . . . data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

55.     **Content.** The ECPA defines content, when used with respect to electronic communications, to "include[] *any* information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

56.     **Interception.** The ECPA defines interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents . . . include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

57.     **Electronic, Mechanical, or Other Device.** The ECPA defines "electronic, mechanical, or other device" as "any device . . . which can be used to intercept a[n] . . . electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

(a)     GM's and OnStar's software and servers;

(b)     LexisNexis' electronic servers.

58.     Without Plaintiff's or Class Members' knowledge or consent, LexisNexis intercepted the contents of their electronic communications when they operated their GM-manufactured vehicles with OnStar capabilities.

59.     LexisNexis intentionally used technology as a means of intercepting and acquiring the contents of Plaintiff's and Class Members' electronic communications, in violation of the Wiretap Act.

60.     LexisNexis intentionally intercepted Plaintiff's and Class Members' information in transit. LexisNexis intercepted Plaintiff's and Class Members' communications with OnStar, aided and abetted by GM, whenever Plaintiff's and

Class Member's vehicles communicated vehicle behavior data, location data, and other electronic communications to OnStar's servers. These communications—which comprise the transfer of signs, signals, writing, images, sounds, data, and/or intelligence transmitted in whole or in party by wire, radio, electromagnetic, photoelectric, or photo-optical system—constitute "electronic communications" under the Wiretap Act and were contemporaneously copied by LexisNexis in real time.

61.    Plaintiff's and Class Members' driving-behavior data and location data was content as defined by the Wiretap Act as it involves the substance and import of Plaintiff's communications with OnStar and not simply routine identifiers or metadata.

62.    Plaintiff and Class Members were not aware that LexisNexis was intercepting its users' electronic communications and tracking their telematic vehicle data. Plaintiff and Class Members did not consent to Defendants' collection of their driving-behavior data. Additionally, the nature of the tracking and collection of information at issue goes beyond what a reasonable consumer would anticipate when operating a vehicle.

63.    By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiff and Class Members to affiliates and other third parties, while knowing or having reason to know that the information was obtained through

the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendants violated 18 U.S.C. § 2511(1)(c).

64.    By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiff and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendants violated 18 U.S.C. § 2511(1)(d).

65.    Plaintiff and Class Members are persons whose electronic communications were intercepted within the meaning of Section 2520. As such, they are entitled to preliminary, equitable and declaratory relief, in addition to statutory damages of the greater of $10,000 or $100 per day for each day of violation, actual damages, punitive damages, and reasonable attorneys' fees and costs of suit.

## SECOND CLAIM FOR RELIEF

### VIOLATION OF THE FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681e(b) ("FCRA")
### (On Behalf of the Class Against LexisNexis)

66.    Plaintiff incorporates the above allegations by reference as if fully set forth herein and bring this count individually and on behalf of the Class.

67.    Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the

19

information concerning the individual about whom the report relates. 15 U.S.C. § 1681e(b).

68.     LexisNexis obtained driving-behavior data and other information, including location data, from GM and OnStar and furnished it to third parties, including automobile insurance companies, without Plaintiff's and Class Members' adequate or appropriate knowledge and consent.

69.     LexisNexis provided consumer information that includes driving-behavior data to third parties, including automobile insurance companies, which constitutes the furnishing of consumer reports under the FCRA and an impermissible purpose and use of data under the FCRA.

70.     LexisNexis, acting as a consumer reporting agency, as defined by 15 U.S.C. § 1681c(1), has failed to implement procedures to maintain maximum possible accuracy regarding Plaintiff's and the Class Members' driving data.

71.     LexisNexis has knowingly and willfully engaged in the collection and production of inaccurate data metrics regarding Plaintiff's and Class Members' driving abilities.

72.     As a result of LexisNexis' reporting of these inaccurate data metrics, insurance carriers and others who view these consumer reports receive and in turn rely on an inaccurate representation of Plaintiff's and Class Members' driving abilities.

73.     The foregoing deceptive acts and practices constitute reckless and/or negligent violations of the FCRA, including, but not limited to, 15 U.S.C. § 1681e(b).

74.     As a result of each and every willful violation of the FCRA, Plaintiff is entitled to actual damages as the Court may allow pursuant to 15 U.S.C. § 1681n(a)(1); statutory damages pursuant to 15 U.S.C. § 1681n(a)(1); punitive damages as the Court may allow pursuant to 15 U.S.C. § 1681n(a)(2); and reasonable attorneys' fees and costs pursuant to 15 U.S.C. § 1681n(a)(3) from Defendants.

75.     As a result of each and every negligent noncompliance of the FCRA, Plaintiff is entitled to actual damages as the Court may allow pursuant to 15 U.S.C. § 1681o(a)(1); and reasonable attorneys' fees and costs pursuant to 15 U.S.C. § 1681o(a)(2) from Defendants.

## THIRD CLAIM FOR RELIEF
### VIOLATION OF THE FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681e(b) ("FCRA")
### (On Behalf of the Class Against GM and OnStar)

76.     Plaintiff incorporates the above allegations by reference as if fully set forth herein and bring this count individually and on behalf of the Class.

77.     "Furnishers" of information to consumer reporting agencies shall not provide inaccurate information relating to any consumer reporting agency if they know or have reasonable cause to believe that the information is inaccurate. 15 U.S.C. § 1681s-2(a)(1)(A)

78.     GM and OnStar, acting as furnishers of consumer information, provided LexisNexis with inaccurate driving-behavior data in connection with GM vehicle owners and lessees.

79.     GM and OnStar knew or should have known that the telematic driving data they collected and sold to LexisNexis was inaccurate or otherwise misleading.

80.     As a result of GM's and OnStar's conduct, insurance carriers and others who view LexisNexis' consumer reports receive and in turn rely on an inaccurate representation of Plaintiff's and Class Members' driving abilities and driving histories.

81.     The inaccurate and misleading information on LexisNexis' consumer reports harmed Plaintiff and Class Members by resulting in significant increases in the auto insurance premiums.

82.     The foregoing deceptive acts and practices constitute reckless and/or negligent violations of the FCRA, including, but not limited to, 15 U.S.C. § 1681e(b).

83.     As a result of each and every willful violation of the FCRA, Plaintiff is entitled to actual damages as the Court may allow pursuant to 15 U.S.C. § 1681n(a)(1); statutory damages pursuant to 15 U.S.C. § 1681n(a)(1); punitive damages as the Court may allow pursuant to 15 U.S.C. § 1681n(a)(2); and reasonable attorneys' fees and costs pursuant to 15 U.S.C. § 1681n(a)(3) from Defendants.

84.    As a result of each and every negligent noncompliance of the FCRA, Plaintiff is entitled to actual damages as the Court may allow pursuant to 15 U.S.C. § 1681o(a)(1); and reasonable attorneys' fees and costs pursuant to 15 U.S.C. § 1681o(a)(2) from Defendants.

**FOURTH CLAIM FOR RELIEF**

**VIOLATION OF THE CONNECTICUT UNLAWFUL
TRADE PRACTICES ACT
Conn. Gen. Stat. § 42-110A, *et seq.* ("CUTPA")
(On Behalf of the Class or, Alternatively, the Connecticut Subclass)**

85.    Plaintiff incorporates the above allegations by reference as if fully set forth herein and bring this count individually and on behalf of the Class or, alternatively, individually by Plaintiff Colin Cogle and on behalf of the Connecticut Subclass.

86.    GM's, OnStar's and LexisNexis' business acts and practices alleged herein constitute unfair, unconscionable and/or deceptive methods, acts or practices under the Connecticut Unlawful Trade Practices Act, Conn. Gen. Stat. § 42-110a, et seq. ("Connecticut UTPA").

87.    At all relevant times, GM, OnStar, and LexisNexis were and are each a "person" within the meaning of Conn. Gen. Stat. § 42-110a(3).

88.    GM's, OnStar's, and LexisNexis' conduct, as set forth herein, occurred in the conduct of "trade" or "commerce" within the meaning of the Connecticut UTPA. Conn. Gen. Stat. § 42-110a(4). The Connecticut UTPA prohibits "[u]nfair

23

methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a).

89.    By reason of the conduct alleged herein, GM's, OnStar's, and LexisNexis' acts and practices are unfair and unconscionable in violation of Connecticut law.

90.    GM's, OnStar's, and LexisNexis' acts and practices also are deceptive in violation of Connecticut consumer law. Had Plaintiff and the Connecticut Subclass members known that the Defendants were collecting and selling their driving behavior information, they would not have purchased or leased their vehicles or would not have purchased or leased them at the prices they did.

91.    Plaintiff and Connecticut Subclass members suffered an ascertainable loss as a direct and proximate result of Defendants' unfair and deceptive acts or practices. Among other injuries, Plaintiff and Connecticut Subclass members overpaid for their vehicles, and their vehicles suffered a diminution in value.

92.    Plaintiff and the Connecticut Subclass members seek actual damages against GM, OnStar, and LexisNexis in an amount to be determined at trial and statutory, treble, and/or punitive damages under the Connecticut UTPA, as well as an order awarding costs, attorneys' fees and restitution, disgorgement of funds, and any other just and proper relief available under the Connecticut UTPA.

## FIFTH CLAIM FOR RELIEF

### INVASION OF PRIVACY (INTRUSION UPON SECLUSION)
### (On Behalf of the Class or, Alternatively, the Connecticut Subclass)

93.    Plaintiff incorporates the above allegations by reference as if fully set forth herein and brings this count individually and on behalf of the Class or, alternatively, the Connecticut Subclass.

94.    Plaintiff and Class Members had a reasonable expectation of privacy in their driving telematics data and personal location information.

95.    By tracking, collecting, storing, distributing and selling Plaintiff's and Class Members' driving-behavior data, location data, and other sensitive information without authorization or consent, Defendants' intentionally intruded upon Plaintiff's and Class Members' solitude or seclusion.

96.    Defendants' intentional intrusion on Plaintiff's and Class Members' solitude or seclusion is highly offensive to a reasonable person, especially considering the sensitive personal location and driving vehicle data that Defendants' monitored, intercepted, transmitted and recorded.

97.    As a result of Defendants' actions, Plaintiff and Class Members have suffered harm and injury, including from the invasion of their privacy rights.

98.    Defendants' conduct infringed Plaintiff's and Class Members' privacy interests in, among other things, (1) allowing the dissemination and/or misuse of their driving-behavior and location data; (2) preventing Plaintiff and Class Members

25

from maintaining control over the type of information that GM and OnStar track and/or record; and (3) preventing Plaintiff and Class Members from making personal decisions and/or conducting personal activities without observation, intrusion, or interference, including being able drive without driving-behavior data being intercepted by LexisNexis without Plaintiff's and Class Members' knowledge or consent.

99.    Plaintiff and Class Members have been damaged as a direct and proximate result of Defendants' invasion of their privacy rights and are entitled to just compensation, including appropriate monetary damages, in an amount to be determined at trial.

## SIXTH CLAIM FOR RELIEF

### UNJUST ENRICHMENT
### (On Behalf of the Class or, Alternatively, the Connecticut Subclass)

100.    Plaintiff incorporates the above allegations by reference as if fully set forth herein and brings this count individually and on behalf of the Class or, alternatively, the Connecticut Subclass based upon universal principles in equity.

101.    Plaintiff lacks an adequate remedy at law and brings this claim in the alternative to his claims at law.

102.    Plaintiff and Class Members conferred benefits on Defendants by consequence of Defendants' receipt of their personal location information and

driving-behavior data, including through the tracking practices challenged in this case.

103.   As set forth herein, GM and OnStar surreptitiously collected and tracked the driving-behavior data, location data, and other information of GM vehicle owners and lessees, even where customers did not authorize or otherwise consent to such information being collected or tracked. GM and OnStar, without the consent or knowledge of Plaintiff or Class Members, sold this highly sensitive information to LexisNexis, generating ill-gotten gain for GM and OnStar.

104.   Upon receiving this highly sensitive information, LexisNexis used it for commercial purposes, including selling or furnishing consumer reports to automobile insurers and other third parties. The sale of these reports generated ill-gotten gain for LexisNexis.

105.   All Defendants were enriched when they commercially exploited Plaintiff's and Class Members' personal location information and driving-behavior data. In doing so, no Defendant conferred any benefit or compensation on Plaintiff or Class Members.

106.   Defendants acquired and sold the driving-behavior data of Plaintiff and Class Members by deceit and in direct contravention of their expectation that Defendants would refrain from such tracking and sale of Plaintiff's and Class Members' data.

107.   Equity and good conscience militate against permitting Defendants to retain the profits and benefits from its wrongful conduct, which should be restored to Plaintiff and Class Members.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and the Class and Subclass defined herein, respectfully requests that this Court:

A.   Certify this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and appoint Plaintiff and his attorneys to represent the Class;

B.   Award compensatory damages, including statutory damages where available, or restitution to Plaintiff and Class Members against Defendants in an amount to be proven at trial, in addition to interest thereon;

C.   Award punitive damages against Defendants under 15 U.S.C. § 1681n(a)(2) and 18 U.S.C. § 2520(b);

D.   Award Plaintiff and Class Members their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E.   Grant such other and further relief as the Court deems appropriate.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury for all claims so triable.

Dated: April 22, 2024                    Respectfully submitted,

By: */s/E. Powell Miller*
E. Powell Miller (P39487)
Emily E. Hughes (P68724)
Dennis A. Lienhardt (P81118)
**THE MILLER LAW FIRM, P.C.**
950 W. University Drive, Suite 300
Rochester, MI 48307
Tel: (248) 841-2200
epm@millerlawpc.com
eeh@millerlawpc.com
dal@millerlawpc.com

Adam E. Polk (*admission* forthcoming)
Jordan Elias (*admission* forthcoming)
Anthony Rogari (*admission* forthcoming)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
apolk@girardsharp.com
jelias@girardsharp.com
arogari@girardsharp.com

*Counsel for Plaintiff and the Putative Classes*

29